COURT OF APPEALS OF VIRGINIA

Present:   Judges Beales, Causey and Senior Judge Haley
Argued at Richmond, Virginia


JAMAL KELVIN BAILEY

OPINION BY
v.        Record No. 0676-22-2        JUDGE RANDOLPH A. BEALES
OCTOBER 10, 2023

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF SPOTSYLVANIA COUNTY
Ricardo Rigual, Judge

(Alexander Raymond, on brief), for appellant.  Appellant
submitting on brief.

Liam A. Curry, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Following a jury trial, Jamal Kelvin Bailey (along with his co-defendants Hugh Cameron Green and Montel Jaleek Wilson) was convicted of three counts of first-degree murder, three counts of abduction with the intent to extort money, three counts of child abuse or neglect, three counts of child endangerment or cruelty, one count of robbery, one count of conspiracy to commit robbery, and one count of conspiracy to commit abduction with the intent to extort money.[1]  On appeal, Bailey argues that the evidence was insufficient to uphold each conviction. Bailey also argues that the "trial court erred when it denied Mr. Bailey's post-trial motion to release the restricted dissemination discovery materials."

---

[1] Green and Wilson also appealed from their convictions.  *See Green v. Commonwealth*, No. 0643-22-2 and *Wilson v. Commonwealth*, No. 0780-22-2, both decided this day.

# I. BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the Commonwealth, [as] the prevailing party at trial." *Scott v. Commonwealth*, 292 Va. 380, 381 (2016). In doing so, the Supreme Court has stated that we must "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Parks v. Commonwealth*, 221 Va. 492, 498 (1980) (quoting *Wright v. Commonwealth*, 196 Va. 132, 137 (1954)).

Jamal Bailey, Hugh Green, Montel Wilson, Durward Allen, and James Myers were all engaged together in drug dealing in the Philadelphia area in 2019.[2] Myers testified at trial that Wilson recruited the four other men to travel from Philadelphia down to the Fredericksburg area as a group to rob Michael Coleman for "Cash and coke." Wilson is Coleman's nephew, and Wilson testified that Coleman often supplied him with cocaine. Wilson's text messages from March 2019 indicate a plan to rob someone in Virginia for at least two kilograms of cocaine.[3] Myers stated that Wilson spoke with him in May 2019 about "trying to set him [Coleman] up . . . to rob." Myers testified that Wilson planned to set up a fake deal with Coleman to purchase cocaine and the rest of the group would then rob Coleman while the supposed deal was taking place.

---

[2] Myers entered a plea agreement with the Commonwealth where he agreed to plead guilty to second-degree felony murder and to conspiracy to commit robbery. Myers also agreed to testify against his accomplices. Under the plea agreement, Myers was to be sentenced to between twenty-four years and four months and thirty-two years and five months of active imprisonment for his two convictions.

[3] Philadelphia Police Officer Jason Seigafuse, an expert in the distribution of narcotics, testified that half a kilogram of cocaine had a value of about $16,500 in Philadelphia in 2019.

The group planned to drive from Philadelphia to a hotel in Fredericksburg on Saturday, May 25, 2019, and then rob Coleman the next day. Wilson's girlfriend rented a van in which Myers, Wilson, and Bailey were to ride, while Allen and Green rode in the Nissan Altima owned by Allen's girlfriend. Allen's text messages from the morning of May 25, 2019, show that Allen added a "real dark" tint to the windows of the Altima that same morning.

Cell phone data for each member of the group shows that the five men left Philadelphia at around 9:50 a.m. on Saturday, May 25, 2019. The group arrived at a hotel in Fredericksburg where Bailey rented two rooms under his name. Myers testified that, later that evening, the men "[m]ade a test run . . . [t]o the Coleman house" so that they could "[s]ee how fast you can get there." The group then went to a Walmart to buy dark clothing.

Myers testified that the group went back to Walmart on Sunday, May 26, 2019, to "get some gloves." Wilson spoke with Coleman over the phone to plan where the two would meet for the "deal." Coleman told Wilson that the two men could meet at Coleman's home. All five members of the group then drove toward Coleman's home using both the rented van and the Altima. Before the group arrived at Coleman's home, both vehicles pulled off into a driveway so that Wilson, Green, Myers, and Bailey could all get into the Altima together. Allen drove off with the van, while the other four men went to Coleman's home riding in the Altima. Myers testified that the four men rode in the Altima because "you can't see in the car" and because Coleman "thought he [Wilson] was by himself."

The group's cell phone data shows that they arrived at Coleman's home at around 12:17 p.m. on Sunday, May 26, 2019. Myers testified that, when the group arrived at Coleman's home, Wilson "[w]ent in the house first, went in there, talked to him [Coleman], came back out and told him [Coleman] he had to come outside to get the money." Myers acknowledged that the group did not bring any money for the supposed deal. Wilson instead grabbed a black bag and a

- 3 -

gun from the car, and Bailey, Myers, and Green then followed Wilson into Coleman's home. Myers, Green, and Bailey all wore a mask to cover their faces, but Wilson did not wear a mask.

Myers testified that when he first entered the house, he saw Wilson already holding a gun on Coleman. Myers also saw Bailey holding a gun in front of Coleman's girlfriend, Rachel Ozuna, the couple's seventeen-month-old son, and the couple's one-month-old daughter. Myers testified that Wilson was asking Coleman "where the money at, where the drugs at." While Wilson was searching for money and drugs, Green and Myers tied up Ozuna and Coleman using a cord that they found inside the house. Wilson found some of Coleman's money and drugs inside the home.

Myers testified that he then discovered Ozuna's fourteen-year-old son K.O.[4] playing video games in his bedroom. K.O.'s friend, C.H., testified that the two friends were talking to each other online while they were playing the video game together remotely at around 12:30 p.m. on Sunday, May 26, 2019, when C.H. heard that someone had "walked in and was like get off, get off right now, and like yelling at him [K.O.] to get off." C.H. testified that he never heard from K.O. again. K.O.'s cell phone data showed that he sent his last text message at 12:49 p.m. on May 26, 2019. Myers testified that he saw K.O. playing a video game, and Myers told K.O. "to come out, sit on the couch with his mom." Myers then tied K.O.'s hands together.

Myers testified that Green then pulled out a knife and grabbed hold of Coleman. After Green took hold of Coleman, Myers and Bailey went outside to search through Coleman's vehicles. Myers testified that Bailey took a bag of money from one of Coleman's vehicles. Myers and Bailey then entered the home, and Myers testified that he saw Coleman bleeding on the floor.

---

[4] We use the initials of those people who are minors in an attempt to protect their privacy.

Myers further testified that Green had slit Coleman's throat and that Green also slit Ozuna's throat. Coleman's body was left in the kitchen area of the home while Ozuna's body was left in a back bedroom. Myers also testified that, after K.O.'s mother and Coleman were killed, Wilson then directed both Myers and Green to kill the fourteen-year-old K.O. because K.O. had seen Wilson's unmasked face. Both Green and Myers refused to kill K.O., and Myers testified that he told Wilson, "I ain't killing no kid, man." Myers, however, stated that "Mal [Bailey] just went to Cam [Green], snatched the knife out of his hand and went in the bathroom and slit [K.O.'s] throat."

The group collected money, drugs, and a firearm that they found inside Coleman's home. They then exited Coleman's home and left both the seventeen-month-old child and the one-month-old infant alive but unattended inside the house with the bodies of their parents and older half-brother. The group took Coleman's cell phones with them but threw K.O.'s cell phone and Ozuna's cell phone into the front yard of the Coleman residence. Cell phone data showed that the group left Coleman's home at around 1:20 p.m. and they returned to Philadelphia at about 5:00 p.m. Myers testified that he received a couple ounces of cocaine and ten thousand dollars as a result of the murders and robbery.[5]

Ben Jimenez, K.O.'s father, testified that he tried to contact K.O. on Tuesday, May 28, 2019, but K.O. did not respond to his father. Jimenez also tried to contact Ozuna, but she did not respond either. On the morning of Wednesday, May 29, 2019, Jimenez drove over to Coleman's home to check on his son K.O. When Jimenez walked in the house through the unlocked door, he saw Coleman lying in a pool of blood with his hands and feet tied together. Jimenez then saw

---

[5] Detective Jesse Hanrahan of the Spotsylvania County Sheriff's Office discovered that Wilson took a photograph of a black bag full of money on May 28, 2019. Detective Hanrahan also testified that Wilson contacted Coleman 111 times in the three days leading up to the murders, but Wilson did not contact Coleman at all after the murders took place.

K.O. on the floor of the bathroom in the same state as Coleman – with his son's hands and feet tied together and lying in a pool of his own blood.

Jimenez frantically called 911, and law enforcement soon arrived. Sergeant Brian Seay of the Spotsylvania County Sheriff's Office first entered Coleman's home. Sergeant Seay's body camera footage shows that he saw Coleman's and K.O.'s bodies exactly as Jimenez had described, and Sergeant Seay then also found Ozuna's body in a child's nursery. Ozuna's throat was also slit, and her hands and feet were likewise bound together with a cord. Ozuna also had a belt wrapped around her neck. Sergeant Seay's body camera footage shows the seventeen-month-old child crawling around near his mother Rachel Ozuna's deceased body. Sergeant Seay then carried the seventeen-month-old child out of the nursery, and he went into another room where he saw the one-month-old infant sitting in an infant's rocking swing. Sergeant Seay carried both children out of the home, and the children were taken to the hospital. Forensic nurse Monika Kral-Dunning testified that she looked after the children at the hospital. Both children were dehydrated, had "horrible diaper rash," and had inflammation and swelling around their genitals when they first arrived at the hospital. Kral-Dunning testified that these symptoms indicated that the children had been unattended for multiple days.

The police investigation of the murders eventually led them to Myers, who was incarcerated in Pennsylvania. Detective Jesse Hanrahan of the Spotsylvania County Sheriff's Office testified that he spoke with Myers in February and March 2020. Myers initially denied any involvement with the murders and robbery. However, Myers soon admitted to Detective Hanrahan that he and the other members of the group were responsible for the murders of K.O., Coleman, and Ozuna. Myers also told Detective Hanrahan that he was concerned about cooperating with law enforcement in this case, given that his cooperation could put the safety of his own family at risk – specifically, the safety of his wife and daughter. Myers then testified at

trial that his wife, who had been ill, had passed away before trial began, but Myers acknowledged at trial that he tried to get his daughter into the witness protection program. Furthermore, Myers acknowledged that Wilson "had connections to" Myers's daughter.

Bailey, Green, Wilson, Allen, and Myers were soon charged with multiple offenses relating to the murders. Prior to Bailey's trial, both counsel for Bailey and the Commonwealth's Attorney jointly moved the trial court to enter a discovery order pursuant to the newly amended Rule 3A:11(c) of the Rules of the Supreme Court of Virginia. According to the trial court's order, the Commonwealth could designate a significant amount of material as "Restricted Dissemination Material." Any material designated as restricted dissemination material would be sealed. As a result of this order, Bailey could view the restricted dissemination materials while preparing for trial and during his trial, but Bailey would be prohibited from keeping a copy of any of the restricted dissemination materials. The trial court entered the requested order, and the Commonwealth designated a significant amount of material as restricted dissemination material.[6]

Bailey, Green, and Wilson were jointly tried together as co-defendants in a jury trial and convicted. Prior to Bailey's sentencing hearing, counsel for Bailey filed a "Motion to Release to Defendant Restricted Dissemination Discovery Materials," where he argued that the trial court should "grant him full access to all Discovery materials in this case so that counsel may then provide him a copy of his entire file and comply with Rule 1:4 of Virginia's Rules of Professional Conduct." At the sentencing hearing, counsel for Bailey argued:

> [A]t this point we had the trial, my client has seen much of the
> information, pertinent relevant information that was made against

---

[6] The record does not specify exactly what pieces of evidence are designated as restricted dissemination material. However, at the sentencing hearing, the Commonwealth's attorney indicated that the material "comprises about of [sic] five hundred gigabytes of data" and "[i]t includes witness information, information gleaned from confidential sources, local and federal as well, it includes names, addresses for all those people, it includes victim information, it includes confidential law enforcement techniques that were used, it includes ongoing federal investigation information, and it is a mass of information."

him, and certainly this is in our file, we're placed in a quandary because he's entitled to his file, and, again, I think just in fairness he's entitled to what the evidence was that was produced and that was delivered to us.

The trial court denied Bailey's motion and reasoned that "the Court finds that no good cause has been shown for the removal of everything that's been designated given the voluminous nature of it." The trial judge went on to state, "If there comes a time during the course of these appellate processes or other proceedings that someone has a specific request to release specific material, then the Court will consider it." Bailey now appeals to this Court.

II. ANALYSIS

A. Restricted Dissemination Material

In his first assignment of error, Bailey argues that the "trial court erred when it denied Mr. Bailey's post-trial motion to release the restricted dissemination discovery materials."

Effective July 1, 2020, the Supreme Court amended Rule 3A:11 to allow the Commonwealth to "designate evidence or material disclosed pursuant to this Rule as 'Restricted Dissemination Material'" prior to a defendant's trial.[7] Rule 3A:11(c)(2). When the accused's attorney agrees with the Commonwealth's Attorney that material should be designated as restricted dissemination material (as was done in this case), then the Commonwealth may designate any material as restricted dissemination material "without supporting certification." Rule 3A:11(c)(2)(A). The Commonwealth may also designate material as restricted dissemination material without an agreement by the accused's attorney by:

> [S]tamping or otherwise marking it as such and providing a certification in writing, upon information and belief, that: (i) the designated material relates to the statement of a child victim or witness; or (ii) disclosure of the designated material may result in

---

[7] The current version of Rule 3A:11 (effective March 1, 2021) was amended "to clarify the meaning of the word 'shall' formerly appearing in th[is] Rule[] and not to change existing law." The March 1, 2021 version of Rule 3A:11(c)(2)(C) and Rule 3A:11(c)(2)(E) replaced the word "shall" with the word "must."

- 8 -

danger to the safety or security of a witness or victim, danger of a witness being intimidated or tampered with, or a risk of compromising an ongoing criminal investigation or confidential law enforcement technique.

Rule 3A:11(c)(2)(B).

Once material is designated as restricted dissemination material, it "may only be disclosed to the accused's attorney, the agents or employees of the accused's attorney, or to an expert witness." Rule 3A:11(c)(2)(C). "The accused's attorney may orally communicate the content of 'Restricted Dissemination Material' to the accused or allow the accused to view the content of such material but must not provide the accused with copies of material so designated." *Id.* "Within 21 days of the entry of a final order by the trial court, or upon the termination of the representation of the accused, the accused's attorney must return to the court all originals and copies of any 'Restricted Dissemination Material' disclosed pursuant to this Rule." Rule 3A:11(c)(2)(E). Once the accused's attorney returns the restricted dissemination material to the trial court, "[t]he court must maintain such returned 'Restricted Dissemination Material' under seal." *Id.* However, "[a]ny material sealed pursuant to this subpart must remain available for inspection by counsel of record." *Id.* "For good cause shown, the court may enter an order allowing additional access to the sealed material as the court in its discretion deems appropriate." *Id.*

Before trial in this case, counsel for Bailey and the Commonwealth's Attorney both agreed to enter a joint restricted dissemination material order pursuant to Rule 3A:11(c)(2)(A). After trial, Bailey asked the trial court to remove the restricted dissemination material designation on the contents of the materials or documents that had been designated as restricted dissemination materials from the trial court's previous order. The trial court denied Bailey's motion and found that Bailey had failed to show good cause for removing the restricted dissemination material designation from all of the materials so designated. *See* Rule

3A:11(c)(2)(E). In general, "[a] lower court's interpretation of the Rules of th[e Supreme] Court, like its interpretation of a statute, presents a question of law that we review de novo." *LaCava v. Commonwealth*, 283 Va. 465, 469-70 (2012). However, the relevant inquiry in this case concerns whether the trial court erred when it found that Bailey failed to show good cause to have the restricted dissemination material designation removed from all of the material so designated. The Supreme Court has previously analyzed similar language, and it has held that "[a] good cause determination invests a trial court with discretion." *AME Fin. Corp. v. Kiritsis*, 281 Va. 384, 392 (2011) (interpreting Rule 3:19(b)); *Stephens v. Commonwealth*, 274 Va. 157, 162 (2007) ("[W]e are of opinion that the good cause requirement reflects a legislative intent to invest circuit courts with discretion . . . ."). In addition, "the use of the word 'may,' as opposed to 'shall,' in [Rule 3A:11(c)(2)(E)] evidences that even after a defendant shows good cause, a trial court has discretion to grant or refuse the defendant's motion . . . ." *Kiritsis*, 281 Va. at 392. Consequently, we review the trial court's interpretation of Rule 3A:11(c) *de novo*, and we review the trial court's "good cause determination" under Rule 3A:11(c)(2)(E) under an abuse of discretion standard of review.

As the moving party below, Bailey was required to show to the trial court good cause for why the restricted dissemination material designation should have been lifted. *Cf. Rakes v. Fulcher*, 210 Va. 542, 545-46 (1970) (moving party must show good cause to obtain documents in pre-trial discovery request). Bailey alleges that the restricted dissemination material order would force counsel for Bailey to violate Rule 1.4 of the Rules of Professional Conduct because counsel for Bailey would be unable to give Bailey his entire case file once the representation terminated.

In general, when a lawyer terminates his representation of a client, the lawyer is required to give to the client all documents in the lawyer's possession that the lawyer obtained throughout

the course of the representation. *See* Rule 1.16(e) of the Rules of Professional Conduct. However, this general rule still has its limitations. *See* Comment 11 of Rule 1.16 of the Rules of Professional Conduct. Relevant to this appeal, Rule 1.4(c) of the Rules of Professional Conduct states (in relevant part), "A lawyer shall inform the client of facts pertinent to the matter and of communications from another party that may significantly affect settlement or resolution of the matter." Comment 7 of Rule 1.4 specifies, however, that "[r]ules or court orders governing litigation may provide that information supplied to a lawyer *may not be disclosed to the client*. Rule 3.4(d) directs compliance with such rules or orders." (Emphasis added).

Given the plain reading of Comment 7 of Rule 1.4 of the Rules of Professional Conduct, counsel for Bailey simply would not violate Rule 1.4 by following the direction of the trial court's order on restricted dissemination materials that was governed by and entered pursuant to Rule 3A:11. Notably, Rule 3A:11(c)(2)(C) expressly prohibits counsel for Bailey from providing Bailey with any copy of the restricted dissemination material. In addition, Rule 3A:11(c)(2)(E) states, "Within 21 days of the entry of a final order by the trial court, . . . the accused's attorney must return to the court all originals and copies of any 'Restricted Dissemination Material.'"[8] Given that Rule 3A:11(c)(2)(C) and Rule 3A:11(c)(2)(E) and the trial court's order provide that counsel for Bailey must not give Bailey any copy of the restricted dissemination materials and that counsel for Bailey must return all pieces of restricted dissemination material back to the trial court after the final order is entered, counsel for Bailey simply would not violate Rule 1.4 of the Rules of Professional Conduct by withholding the material designated as "Restricted Dissemination Material" from Bailey. Consequently, Bailey

---

[8] The trial court's order uses the language from the July 1, 2020 version of Rule 3A:11 which included the word "shall." The March 1, 2021 version of Rule 3A:11(c)(2)(C) and Rule 3A:11(c)(2)(E) has replaced the word "shall" with the word "must."

has simply not shown good cause for requiring the removal of the restricted dissemination material designation on this basis.

Furthermore, the trial court did not abuse its discretion in denying Bailey's motion, given the ongoing risk to the safety of Myers's family – and the possibility of disrupting ongoing investigations in other jurisdictions. Indeed, the recent amendments to Rule 3A:11(c) certainly make clear that the Supreme Court has intended to provide the Commonwealth the opportunity to develop evidence in a case without compromising the safety of potential witnesses or their families or without compromising separate criminal investigations. Under Rule 3A:11(c)(2)(B)(ii), when the Commonwealth designates evidence as restricted dissemination material *without* the agreement of the accused's counsel, the Commonwealth must certify that the "disclosure of the designated material may result in danger to the safety or security of a witness or victim, danger of a witness being intimidated or tampered with, or a risk of compromising an ongoing criminal investigation or confidential law enforcement technique." Although the Commonwealth is not required to provide such certification when the accused's attorney agrees to designate evidence as restricted dissemination material, the Commonwealth and the accused's attorney may still choose to designate the material for the same reasons that are outlined in Rule 3A:11(c)(2)(B)(ii). In fact, the Commonwealth and the accused's attorney may even elect to designate evidence as restricted dissemination material for a wider range of reasons, such as evidence involving issues of national security.

In this case, the record clearly shows that Myers expressed significant concerns about cooperating with law enforcement because he believed that the safety of his family (especially his daughter) would be put at risk if he assisted in the investigation and prosecution. Indeed, nothing in the record suggests that the safety of Myers's daughter and family is no longer at risk now that Bailey's trial has finished. Instead, Myers's testimony suggests that his daughter's life

is actually still in danger, given that Wilson "had connections to" Myers's daughter and the fact that protections have been put in place to provide her with safety. Consequently, given the ongoing risk to the safety of Myers's daughter and family and given Rule 3A:11(c)'s clear intent to protect the safety of witnesses and their families, the trial court did not abuse its discretion in denying Bailey's request to lift the designation of "Restricted Dissemination Material" for all of those documents so designated for Bailey's trial.

## B. Sufficiency of the Evidence

Bailey also argues that the evidence was insufficient to sustain his convictions for three counts of first-degree murder, three counts of abduction with the intent to extort money, three counts of child abuse or neglect, three counts of child endangerment or cruelty, one count of robbery, one count of conspiracy to commit robbery, and one count of conspiracy to commit abduction with the intent to extort money. On appeal, Bailey argues that "[t]he only evidence that Mr. Bailey was present---much less involved---at the murders came from Mr. James Myers. However, at the time of Myers'[s] 'confession' he was facing felony charges in Pennsylvania and was desperate to get help from the Spotsylvania Detectives."

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is "plainly wrong or without evidence to support it."'" *Secret v. Commonwealth*, 296 Va. 204, 228 (2018) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (quoting *Pijor*, 294 Va. at 512). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Williams v. Commonwealth*, 278 Va. 190, 193 (2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

The Supreme Court has often stated, "the credibility of witnesses and the weight to be given to their testimony are questions exclusively for the jury." *Johnson v. Commonwealth*, 224 Va. 525, 528 (1982). This Court will only disturb a jury's credibility determination when the witness's "testimony is inherently incredible." *Juniper v. Commonwealth*, 271 Va. 362, 415 (quoting *Walker v. Commonwealth*, 258 Va. 54, 71 (1999), *cert. denied*, 528 U.S. 1125 (2000)), *cert. denied*, 549 U.S. 960 (2006). "To be 'incredible,' testimony 'must be either so manifestly false that reasonable men ought not to believe it, or it must be shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ.'" *Id*. (quoting *Cardwell v. Commonwealth*, 209 Va. 412, 414 (1968)). In addition, the Supreme Court has also articulated that "[i]t is well settled in Virginia that an accused may be convicted upon the uncorroborated testimony of an accomplice." *Johnson*, 224 Va. at 527; *see also Yates v. Commonwealth*, 4 Va. App. 140, 144-45 (1987) (holding that an accomplice who testified pursuant to a plea agreement was not inherently incredible).

In this case, Myers testified that he participated in Wilson's plan to drive from Philadelphia to Fredericksburg to rob Michael Coleman for "Cash and coke" and that this plan led to the abduction and murders of Coleman, Ozuna, and K.O. – and the abandonment of Coleman's and Ozuna's toddler and infant, who were left behind with their older brother's and parents' dead bodies. Myers unequivocally testified that Bailey was one of the five members of the group who all took part in executing Wilson's plan. Myers testified that he saw Bailey pointing a gun at Coleman, Ozuna, and the toddler and infant. Myers also testified that Bailey "snatched the knife out of [Green's] hand and went in the bathroom and slit [K.O.'s] throat" when Green and he had refused to murder a child.

The record before this Court on appeal overwhelmingly supports the jury's implicit finding that Myers's testimony was credible because a significant amount of evidence

corroborates Myers's description of the murders and the group's involvement in the conspiracy to rob Coleman. For example, Wilson's text messages in the months leading up to May 2019 show that he was actively recruiting people to rob someone in Virginia of at least two kilograms of cocaine. In addition, Bailey's cell phone data confirms the sequence of events that Myers described in his testimony, such as the fact that Bailey rode with the other members of the group from Philadelphia to Fredericksburg on the morning of Saturday, May 25, 2019. That data also confirms that the group went on a test run to Coleman's home after arriving in Virginia on Saturday, and that the group then went to Walmart – which Myers explicitly described in his testimony. Cell phone data also confirms that the group drove back to Walmart Sunday morning before arriving at the Coleman residence to carry out their planned robbery. Furthermore, Myers testified about how the group acted in concert with each other to move Coleman (and his family) around Coleman's home at gunpoint – while Wilson demanded money from Coleman as he, Green, Bailey, and Myers searched Coleman's home and vehicles for money and drugs.

Myers also testified that he commanded K.O. to leave his bedroom and join his mother on the living room couch. K.O.'s friend, C.H., corroborated Myers's account when C.H. testified that C.H. heard that someone had "walked in and was like get off, get off right now, and like yelling at him [K.O.] to get off." C.H. testified that this was the last time he ever heard from his friend K.O., and Myers testified that Bailey slit K.O.'s throat at some point after the boy was forced out of his bedroom.

In addition, the forensic evidence amply supports Myers's description of the murders, given that Coleman, Ozuna, and K.O. were all discovered to have had their hands and legs tied and their throats slit. Sergeant Seay's harrowing body camera footage also corroborates Myers's testimony because the footage shows that each of the victims' bodies was discovered in the exact same room where Myers testified that each specific murder occurred. In addition, Sergeant

Seay's body camera footage also shows that Coleman's and Ozuna's toddler and infant were discovered alive inside the home days after the murders took place. Forensic nurse Kral-Dunning testified that both children were dehydrated and suffered from "horrible diaper rash" and swelling as a result of being left unattended for multiple days.

Although Myers testified about the murders and other crimes in which he took part, pursuant to a plea agreement, the Commonwealth's evidence extensively corroborated Myers's testimony. Consequently, we clearly cannot say that Myers's testimony describing Bailey's active involvement in the murders, the robbery, the abductions, the conspiracy to commit robbery, and the conspiracy to commit abduction with the intent to extort money is inherently incredible as a matter of law. Therefore, given Myers's credible testimony, given the significant amount of cell phone data showing that Bailey was at the location of the crimes, and given the forensic evidence showing the gruesome deaths of Coleman, Ozuna, and K.O., we certainly cannot say that no rational factfinder could have found the evidence sufficient to convict Bailey of first-degree murder, robbery, conspiracy to commit robbery, abduction with the intent to extort money, and conspiracy to commit abduction with the intent to extort money. In addition, given the multiple injuries that the one-month-old infant and the seventeen-month-old child suffered after they were abandoned in their home after their parents were brutally murdered there, we also certainly cannot say that no rational factfinder could have found the evidence

sufficient to convict Bailey of child abuse and neglect under Code § 18.2-371.1[9] and child endangerment under Code § 40.1-103.

### III. CONCLUSION

In short, highly credible evidence in the record shows that Jamal Bailey took part in Wilson's cold-blooded scheme to rob Michael Coleman for drugs and money, and Bailey then held Coleman and Ozuna up at gunpoint before mercilessly slitting the throat of a fourteen-year-old boy after his mother Rachel Ozuna and Coleman were also brutally murdered. Then, after every person who could have cared for the seventeen-month-old toddler and one-month-old infant had been murdered, Bailey, Green, Wilson, and Myers left the toddler and the infant alone for multiple days without anyone to attend to even their most basic needs. The abandonment of the children led to their suffering from significant injuries and from dehydration until they were finally discovered three days later. Consequently, given James Myers's credible testimony, given the ample forensic evidence, and given the highly detailed cell phone data admitted in this case, the totality of all of this evidence is certainly sufficient to convict Bailey of each of the crimes for which he was convicted. In addition, the trial court did not abuse its discretion when it denied Bailey's motion to release the restricted dissemination materials to him, especially given the serious ongoing risks of doing so for the safety of a key witness's family members.

---

[9] For the first time on appeal, Bailey argues that the Commonwealth failed to prove that Bailey was a custodian of any of the three children for his child abuse or neglect convictions under Code § 18.2-371.1. However, Bailey did not make this specific argument in either his motion to strike at trial or in his motion to set aside the jury's verdict. Bailey does not invoke the ends of justice exception to Rule 5A:18, and this Court will not apply that exception *sua sponte*. *See Edwards v. Commonwealth*, 41 Va. App. 752, 761 (2003) (*en banc*). Consequently, Bailey has failed to preserve this argument for appeal. *See* Rule 5A:18. Furthermore, Bailey and his co-conspirators were the only adults left alive in the house to look after the tiny children when they abandoned the one-month-old baby and the seventeen-month-old child after murdering their parents and older half-brother.

For all of these reasons, we uphold each of Bailey's convictions and affirm the judgment of the trial court.

*Affirmed.*